# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39954**

———————————

**UNITED STATES**
*Appellee*

**v.**

**William H. MARABLE**
Airman First Class (E-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 10 December 2021

———————————

*Military Judge:* Christopher M. Schumann.

*Sentence:* Sentence adjudged on 28 May 2020 by GCM convened at Creech Air Force Base, Nevada. Sentence entered by military judge on 10 June 2020: Dishonorable discharge, confinement for 12 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Jenna M. Arroyo, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Alex B. Coberly, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Chief Judge JOHNSON and Senior Judge KEY joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

MEGINLEY, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, in accordance with his pleas and pursuant to a plea agree-

ment, of one specification of conspiracy to obstruct justice, in violation of Article 81, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 881, and three specifications of obstruction of justice, all in violation of Article 131b, UCMJ, 10 U.S.C. § 931b. The military judge sentenced Appellant to a dishonorable discharge, confinement for 12 months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on Appellant's sentence.[1]

Appellant raises three assignments of error (AOEs): (1) whether the convening authority's failure to withdraw and dismiss with prejudice a specification of accessory after the fact to involuntary manslaughter, in violation of Article 78, (UCMJ), 10 U.S.C. § 878, as reflected on the entry of judgment (EoJ), constituted noncompliance with a material term of the plea agreement between Appellant and the convening authority; (2) whether the military judge abused his discretion by allowing trial counsel to make an improper sentencing argument; and (3) whether Appellant's sentence is inappropriately severe in light of the adjudged sentence in a similar case.[2]

Regarding Appellant's first AOE, we agree with Appellant and find the convening authority failed to withdraw and dismiss with prejudice Charge I and its Specification, pursuant to the plea agreement. We dismiss the Specification of Charge I and Charge I with prejudice. As for the remaining issues, we find no error that has materially prejudiced the substantial rights of Appellant, and affirm the findings and sentence.

# I. BACKGROUND

Appellant joined the Air Force in December 2015 and at the time of his offenses was stationed at Creech Air Force Base, Nevada. As part of his plea agreement, Appellant agreed to a stipulation of fact which forms the basis for the following factual background.

On 2 May 2019, Appellant participated in a softball game in the Las Vegas, Nevada area. After the game, Appellant met up with Staff Sergeant (SSgt)

---

[1] All offenses occurred on or after 1 January 2019. Thus, all references to the UCMJ and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.). Further, the Military Justice Act of 2016, National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 5001–5542 (23 Dec. 2016), as fully implemented by Exec. Order 13,825, 83 Fed. Reg. 9889 (8 Mar. 2018), applied to Appellant's court-martial and post-trial processing.

[2] Appellant's third AOE is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

Brian Alton in Las Vegas at a local pizza restaurant for drinks.[3] Both Appellant and SSgt Alton arrived at 2300 and sat at the bar in the restaurant. During the evening, Appellant and SSgt Alton consumed a significant amount of alcohol, each having at least seven drinks consisting of various beers and liquors. Both Appellant and SSgt Alton paid for some of the items; they also received free drinks from the bartender, who was familiar with Appellant and SSgt Alton. At approximately 0408 on 3 May 2019, the two left the restaurant to return to SSgt Alton's residence in SSgt Alton's Ford F-150 pickup truck.

SSgt Alton drove home that morning, while Appellant rode as a passenger. Appellant was not paying attention to the drive, as he was tired from the night. Approximately two minutes after leaving the restaurant, Appellant heard SSgt Alton repeating, "I think I just hit someone," or words to this effect, in a shocked, monotone voice. At this point, Appellant became alert. SSgt Alton did not stop his truck, but continued to drive until he reached his residence.

Upon arriving at SSgt Alton's residence in Las Vegas, at approximately 0415, SSgt Alton backed his truck into his driveway. Once SSgt Alton and Appellant exited the vehicle, they observed blood covering a significant portion of SSgt Alton's truck, that the driver-side headlight was missing, and the fender had significant damage. There was also blood inside the wheel well of the vehicle. SSgt Alton retrieved cleaning supplies from inside his residence and began to wipe the wheel well and fender in an effort to remove the blood.

After observing the damage, SSgt Alton said that he had to return to the area where the incident occurred and told Appellant that pieces of his vehicle, which had been left behind at the scene, could have the vehicle identification numbers (VIN) on them, which could incriminate him. SSgt Alton asked Appellant to return with him to the scene, and Appellant agreed. At approximately 0422, they left SSgt Alton's residence and intermittently jogged and ran nearly a mile back to the incident location. Once they arrived, Appellant saw the remains of a person, later identified as FM (a retired military member), lying dead on the side of the road; FM's leg had been separated from his torso. FM was in the middle of the crosswalk when SSgt Alton's vehicle struck him. Neither SSgt Alton, nor Appellant, checked FM for signs of life, but instead, retrieved pieces of SSgt Alton's vehicle scattered around the site. During his providence inquiry, Appellant acknowledged they picked up the pieces of the vehicle "to try and keep [SSgt Alton] from getting in trouble": "[S]ince he had hit someone with this truck, we thought there was a very real chance that

---

[3] The court notes that SSgt Alton is Appellant's co-conspirator and was court-martialed in July 2021 for his role in this series of events and crimes. SSgt Alton's case was docketed with this court on 30 November 2021, No. ACM 40125.

the police would be looking into the accident." The removal of the vehicle pieces from the scene constituted the first of the obstruction of justice specifications.

While they were searching for pieces of SSgt Alton's vehicle and gathering wreckage, an unnamed bicyclist arrived at the scene. Appellant hid the pieces of the vehicle he had gathered in the bushes on the side of the road. This bicyclist stated he was on his way to work. A second bicyclist, JT, later arrived to the scene. Appellant told the bicyclists that he and SSgt Alton were on their way home from a bar and that he was going to call 911 for the police to respond. During his providence inquiry, Appellant stated he told JT he would call emergency services "in order for [JT] to be able to ride off so we could continue doing what we were set out to do." Both bicyclists then left the scene. Appellant did not call 911 for emergency services but continued to gather vehicle pieces. Falsely telling JT that Appellant was going to call 911 was the second obstruction of justice specification.

After the bicyclists left, Appellant and SSgt Alton retrieved the vehicle pieces they hid in the bushes and ran back to SSgt Alton's residence with the pieces. Once they arrived, they put the pieces in the rear compartment of SSgt Alton's girlfriend's vehicle. By this point, SSgt Alton's and Appellant's clothes were covered in blood. Planning to next dispose of the vehicle pieces and concerned about being detected by security cameras present, the two men decided to change clothes. They went into the residence, and SSgt Alton gave Appellant a clean shirt to change into.

Appellant and SSgt Alton went back outside and got into SSgt Alton's girlfriend's vehicle at approximately 0500 and drove for approximately 10 to 15 minutes towards Mount Charleston, Nevada. Once SSgt Alton reached a point where they did not believe anyone would see them, SSgt Alton pulled over. He and Appellant got out of the car, grabbed the vehicle pieces they had retrieved from the scene, and threw the pieces in the desert in an effort to ensure they would not be found. They returned to SSgt Alton's residence at approximately 0535. Discarding the vehicle pieces in the desert constituted the third obstruction of justice specification.

Once at SSgt Alton's residence, SSgt Alton parked across the street from his residence, and he and Appellant walked over to his house. Once back at his residence, SSgt Alton and Appellant went inside and eventually fell asleep.

Appellant woke up at 0630 when officers with the Las Vegas Metropolitan Police Department (PD) entered the bedroom where he slept.[4] At 0715, under rights advisement, Appellant told police officers SSgt Alton had "hit something," "we weren't sure what we hit for sure," and that he "personally . . . ran inside, and [ ] tried to go to bed . . . ." When asked if he and SSgt Alton had any idea what they might have hit, Appellant responded, "Not really, no." Appellant confessed to his actions at the scene of the accident in a statement provided to AFOSI.

## II. DISCUSSION

### A. Plea Agreement and Entry of Judgment

#### 1. Additional Background

Appellant initially faced three charges with a total of five specifications. As part of his plea agreement with the convening authority, Appellant waived his right to a trial by members and requested to be tried by military judge alone. In exchange for Appellant's pleas of guilty, the convening authority agreed to direct trial counsel to withdraw and dismiss *with prejudice* Charge I and its Specification, which alleged Appellant was an accessory to involuntary manslaughter, in violation of Article 78, UCMJ, after the military judge accepted Appellant's guilty plea, "but before entry of findings." Also, in exchange for Appellant's pleas of guilty, the plea agreement required the military judge, upon acceptance of Appellant's guilty pleas, to enter concurrent segmented sentences and that the adjudged confinement sentences to be within the range agreed upon for each offense. In accordance with the agreement, Appellant's confinement exposure was a minimum of six months and a maximum of 12 months. There were no other limitations on sentence.

After the court issued its findings, the military judge asked trial counsel, "consistent with the plea agreement," whether the Government "wish[ed] . . . .

---

[4] The stipulation of fact fails to explain how SSgt Alton and Appellant were determined to be suspects. According to a defense motion, which contained a Las Vegas Metropolitan PD "Declaration of Arrest Report," JT dialed 911 at 0457 to alert authorities he found a "dismembered leg" on a sidewalk. Las Vegas Metropolitan PD arrived on the scene, and patrol officers began to check the neighborhoods for vehicles with collision damage. At 0611, an officer located SSgt Alton's truck with "severe collision damage on the left side, headlight, and bumper." Officers ran a check on the vehicle's license plate, discovered the truck belonged to SSgt Alton, and then went to his house. According to the officers, when asked about the damage to his vehicle, SSgt Alton responded that he "did not have any explanation of how the damage occurred." Officers then spoke to Appellant, who eventually told them that he and SSgt Alton were involved in a collision. The court only offers this information to provide additional context to the stipulation of fact.

to state for the record [its] intention to withdraw and dismiss Charge I and the specifications [sic] consistent with the plea agreement?" Trial counsel responded, "Yes, Your Honor." The military judge then entered the sentencing phase of Appellant's trial.

Despite the military judge asking trial counsel to state their intent regarding Charge I and its Specification, Appellant rightfully points out that "[e]ntirely absent from the transcript of the proceedings is any discussion that Charge I and its Specification was to be withdrawn and dismissed with prejudice as specified in the plea agreement." Although both the Statement of Trial Results (STR) and the entry of judgment (EoJ) state Charge I and its Specification were withdrawn and dismissed, neither document states it was withdrawn and dismissed *with prejudice*. We also note the convening authority's decision on action does not make any reference to the fact that Charge I and its Specification were to be withdrawn and dismissed with prejudice. Finally, there is no indication that Appellant failed to fulfill any of the provisions of the plea agreement.[5]

### 2. Law and Analysis

Since the implementation of the Military Justice Act of 2016, servicemembers facing trial by court-martial may enter into plea agreements with convening authorities; prior to the act's implementation, such agreements were known as pretrial agreements (PTAs). We find our superior court's precedent with respect to PTAs instructive when interpreting plea agreements. "A pretrial agreement in the military justice system establishes a constitutional contract between the accused and the convening authority." *United States v. Smead*, 68 M.J. 44, 59 (C.A.A.F. 2009) (citing *United States v. Lundy*, 63 M.J. 299, 301 (C.A.A.F. 2006)). "In a criminal context, the [G]overnment is bound to keep its constitutional promises . . . ." *Lundy*, 63 M.J. at 301. "When an appellant contends that the [G]overnment has not complied with a term of the agreement, the issue of noncompliance is a mixed question of fact and law." *Smead*, 68 M.J. at 59 (citing *Lundy*, 63 M.J. at 301). Appellant has the burden to establish both materiality and noncompliance. *Lundy*, 63 M.J. at 302. "In the event of noncompliance with a material term, we consider whether the error is susceptible to remedy in the form of specific performance or in the form of alternative relief agreeable to the appellant." *Smead*, 68 M.J. at 59 (citation omitted).

---

[5] The Government does not object to Appellant's requested relief on this AOE and does not oppose Appellant's request for Charge I and its Specification to be dismissed with prejudice.

Proper completion of post-trial processing is a question of law that this court reviews de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citing *United States v. Kho*, 54 M.J. 63 (2000)). We also review de novo interpretation of a statute, *United States v. Martinelli*, 62 M.J. 52, 56 (C.A.A.F. 2005) (citation omitted), and interpretation of a Rule for Courts-Martial, *United States v. Hunter*, 65 M.J. 399, 401 (C.A.A.F. 2008) (citation omitted).

"The Judge Advocate General, the Court of Criminal Appeals, and the [United States] Court of Appeals for the Armed Forces may modify a judgment in the performance of their duties and responsibilities." R.C.M. 1111(c)(2). "A record of trial found to be incomplete or defective before or after certification may be corrected to make it accurate. A superior competent authority may return a record of trial to the military judge for correction under this rule." R.C.M. 1112(d)(2). "Such superior competent authorities may also return the [record of trial] back to the Chief Trial Judge, [Air Force Trial Judiciary], for correction of any defective record." Department of the Air Force Instruction 51-201, *Administration of Military Justice*, ¶ 13.53.3.3.1 (18 Jan. 2019, as amended by DAFGM 2021-02, 15 Apr. 2021). "If a case is remanded to a military judge, the military judge may modify the judgment consistent with the purposes of the remand." R.C.M. 1111(c)(3).

Appellant argues the dismissal with prejudice provision of the plea agreement was material to his plea of guilty because it provided him the "necessary assurance that he would not later face prosecution on the basis of this same charge" for which there was an agreement to dismiss with prejudice. We agree. In our decretal paragraph, we dismiss, with prejudice, the Specification of Charge I and Charge I.

**B. Trial Counsel's Sentencing Argument**

**1. Additional Background**

Appellant asserts that the military judge abused his discretion by allowing trial counsel to argue that Appellant was "evincing a continuous course of deceptive conduct due to statements in his character letters that Appellant's decisions were influenced by a friend who was also a superior."

For clarification, trial counsel did not specifically allege during her argument that Appellant was "evincing a continuous course of deceptive conduct." The deceptive conduct Appellant now refers to stems from information contained within two character letters *introduced by Appellant* in pre-sentencing: one letter from his father, JM, the other letter from his brother, HM. In his character letter, JM acknowledged that Appellant's crimes were serious and his son must be held accountable. JM further stated that Appellant found himself in a "very difficult and extraordinary circumstance," and, "*I believe those*

*choices were motivated primarily from fear and from taking direction from someone who was not only his friend but also his superior.*" (Emphasis added). As for HM's character letter, he notes some of the same information as JM. HM also states that Appellant, "*did indeed use bad judgement during an awful situation, but he also accepted direction from a friend and a superior.*" (Emphasis added). These two statements serve as the basis for this AOE.

Trial counsel began her argument by recommending that Appellant be reduced to E-1, be confined for 12 months, and be dishonorably discharged, and she articulated some of the facts to justify this recommendation. While focusing on Appellant's rehabilitative potential, trial counsel stated Appellant "is going to be hard to rehabilitate when every decision he makes [is] a self-serving [decision] to keep himself out of trouble." After referencing the statements made by Appellant's family members that Appellant took "direction from a friend and a superior," trial counsel questioned why Appellant's family members made these statements. Trial counsel argued,

> Your Honor, it appears through these documents that [Appellant] is acting under the influence of rank. But that is not true. We need to ask ourselves why his brother and father think this is true. The defense is not talking to [Appellant's] family. Or the prosecution is not talking to [Appellant's] family. Law enforcement is not talking to [Appellant's] family[.]

At this point, trial defense counsel objected to trial counsel's argument, stating there were no facts "in evidence about who has talked to [Appellant's] family." Trial counsel responded it was reasonable to infer this from the facts "and it should be able to be argued before the court." The military judge overruled the objection.

Trial counsel then stated,

> [Appellant] is the one telling his family that he is acting under the influence of rank. But that is not true. That is [sic] doing the wrong thing yet again because it is easier to do the wrong thing than it is to do the right thing. Sergeant Alton and [Appellant], they are not even in the same unit or the same chain of command.

Trial defense counsel again objected, stating these were not facts in evidence. The military judge then pointed out to trial defense counsel that the plea agreement indicated Appellant and SSgt Alton were in different squadrons; trial defense counsel then withdrew his objection. The military judge advised the parties, "To the extent that the character references [ ] make references to the belief on the part of family members that [maybe] the accused was

influenced by [a] superior I will take that into context with the knowledge that they are not in the same squadron."

Trial counsel then turned to address Appellant's interview with civilian law enforcement officers which took place shortly after Appellant helped SSgt Alton dispose of the evidence. She said that in that interview, the officers asked Appellant how he knew SSgt Alton, and Appellant explained that they were good friends who worked on the same base, but did not work together. From there, trial counsel told the military judge,

> This is important because [Appellant] is telling his family that he acted under the influence of a supervisor [sic] acted under Sergeant Alton's influence, but it is just to cover up his actions again[;] it is to deflect the responsibility for his actions. . . . Every time [Appellant] has a chance to do the right thing, he fails his responsibility and does the easy thing. He is not learning from his actions but rather is learning to continue to deceive others.

Trial defense counsel did not object at any other point in trial counsel's argument. During his argument, trial defense counsel argued:

> [Appellant] is not in the best situation to be making decisions because he has consumed a lot of alcohol and he is tired. He follows the directions because those directions tell him exactly what he needs to do. . . . [Appellant] returns to the scene and continues to follow [SSgt] Alton's directions about what to do. . . . [T]he facts we are dealing with here are about somebody who is terrified, frankly drunk, tired, made a horrible decision to follow a friend's directions.

Appellant now argues the military judge abused his discretion in allowing trial counsel to make an argument based on the contents of JM and HM's character letters, as there were no facts in evidence to support trial counsel's comments, the comments were not proper aggravation evidence under R.C.M. 1001(b)(4), and the comments did not demonstrate a "continuous course of conduct involving the same crimes, the same victims, and a similar situs within the military community."

### 2. Law

Prosecutorial misconduct and improper argument are questions of law that we review de novo. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (citing *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017)).

When preserved by an objection, an allegation of improper argument is reviewed to determine whether the military judge's ruling constitutes an abuse of discretion. *Sewell*, 76 M.J. at 18 (citations omitted). A military judge abuses

his discretion when "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

"Trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." R.C.M. 1001(b)(4).

Trial counsel can "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). "During sentencing argument, the trial counsel is at liberty to strike hard, but not foul, blows." *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) (internal quotation marks and citation omitted). We consider whether "trial counsel's comments, taken as a whole, were so damaging that we cannot be confident' that [the appellant] was sentenced 'on the basis of the evidence alone.'" *United States v. Erickson*, 65 M.J. 221, 224 (C.A.A.F. 2007) (quoting *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005)). Where the weight of the evidence amply supports the sentence imposed, we can be confident Appellant was sentenced on the basis of the evidence alone. *See Halpin*, 71 M.J. at 480. In assessing the impact of improper sentencing argument on an appellant's substantial rights in the absence of an objection, we ask whether the outcome would have been different without the error. *United States v. Norwood*, 81 M.J. 12, 19–20 (C.A.A.F. 2021), *cert. denied*, 141 S. Ct. 2864 (2021).

**3. Analysis**

We find that the military judge erred in permitting trial counsel to argue that Appellant attempted to minimize his culpability in discussions with his family and that the military judge abused his discretion in overruling the Defense's objection to this argument.

There is no evidence in the record about what, if any, personal involvement Appellant had in obtaining the character letters from his brother and father. There is no evidence Appellant discussed his case with them in any detail at all. There is no evidence explaining how Appellant's brother and father came to the assessment they did or what the source of their information was. Most importantly, there is no evidence Appellant ever told his father and brother he

behaved the way he did based upon SSgt Alton's influence. A fair argument would have been that Appellant's father and brother were trying to minimize Appellant's culpability, and their letters, therefore, should be given little or no weight. Instead, trial counsel argued Appellant had deceived his family in an effort to deflect responsibility during the days leading up to his court-martial. This argument portrayed Appellant as a liar who was willing to shade the truth to even his own father and brother, a portrayal which fed into trial counsel's argument that Appellant "is not learning" and who thus deserved a stronger sentence based upon his poor rehabilitative potential.

The court recognizes an accused's attitude towards the offenses of which he or she has been convicted is a relevant sentencing consideration. *See, e.g.*, *United States v. Anderson*, 25 M.J. 779, 781 (A.C.M.R. 1988) (citations omitted). However, trial counsel is limited to arguing reasonable inferences derived from "the evidence of record." *Baer*, 53 M.J. at 237 (citation omitted). Here, with no perceptible evidentiary basis, trial counsel asserted the lines in the two character letters were the product of Appellant trying to minimize his personal responsibility for his crimes. Once the military judge overruled the Defense's objection on this point, trial counsel proceeded to squarely attack Appellant's rehabilitative potential by arguing he had been deceiving his family members about his degree of culpability. This was not merely a hard blow, but a foul one, and we find the military judge abused his discretion by overruling the Defense's objection.

However, despite our conclusions, we find Appellant is not entitled to relief. Reversal based upon improper sentencing argument is only appropriate when a court cannot conclude an appellant was sentenced on the evidence alone. *United States v. Frey*, 73 M.J. 245, 249 (C.A.A.F. 2014) (citations omitted). Given the nature of Appellant's crimes, the record, and the terms of Appellant's plea agreement, we are confident Appellant was sentenced on the evidence alone and we are convinced trial counsel's argument regarding the character letters had no bearing on the military judge's sentence, and ultimately, he was not materially prejudiced by trial counsel's argument.

## C. Sentence Comparison and Appropriateness

Appellant argues his sentence is inappropriately severe in light of the adjudged sentence in SSgt Alton's court-martial, which occurred on 28 July 2021. On 2 September 2021, this court granted Appellant's motion to attach SSgt Alton's STR from his court-martial, dated 28 July 2021. According to this STR, SSgt Alton's sentence included 14 years of confinement and a dishonorable discharge.

The crux of Appellant's argument is that "[Appellant] was *not* the one who struck and fatally injured the victim," Appellant's youth (noting he was 23

years old at the time of the offenses), his character letters, and the fact that he pleaded guilty to his crimes, renders his sentence inappropriate. Appellant also argues that "it is not surprising that [SSgt Alton] received [a] dishonorable discharge. In contrast, [Appellant]—who was convicted of a fraction of the offenses that SSgt [Alton] was convicted of—was not deserving of a dishonorable discharge." Appellant believes his "sentence of a dishonorable discharge is highly disparate when compared with SSgt [Alton's] sentence of a dishonorable discharge."

**1. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to determine sentence appropriateness, "which reflects the unique history and attributes of the military justice system, includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

In exercising sentence appropriateness review, "[t]he Courts of Criminal Appeals are required to engage in sentence comparison only 'in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *Sothen*, 54 M.J. at 296 (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)). An appellant bears the burden of demonstrating that any cited cases are "closely related" to the appellant's case and the sentences are "highly disparate." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). Closely related cases include those which pertain to "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Id.* If an appellant meets his or her burden to demonstrate closely related cases involve highly disparate sentences, the Government "must show that there is a rational basis for the disparity." *Id.*

"Sentence comparison does not require sentence equation." *United States v. Durant*, 55 M.J. 258, 260 (C.A.A.F. 2001). "[T]he military system must be

prepared to accept some disparity in the sentencing of codefendants, provided each military accused is sentenced as an individual." *Id.* at 261 (citations omitted). "[C]harging decisions by commanders in consultation with their trial counsel, as well as referral decisions by convening authorities after advice from their Staff Judge Advocates, can certainly lead to differences in sentencing." *Id.*

### 2. Analysis

When reviewing a sentence under Article 66, UCMJ, with a few exceptions, this court is generally limited to what is in the record of trial. *United States v. Jessie*, 79 M.J. 437, 441 (C.A.A.F. 2020) (*citing United States v. Fagnan*, 30 C.M.R. 192, 194 (C.M.A. 1961)). As the Government points out, "there is no identified exception for matters raised in a post-trial sentence appropriateness argument," and argues that the CAAF's recent decision in *United States v. Willman*, 81 M.J. 355 (C.A.A.F. 2021), "confirms that an outside-the-record submission is not to be considered in a sentence appropriateness analysis." Appellant argues that the attached STR is necessary for this court to compare Appellant and SSgt Alton's sentence and that nothing in *Jessie* "disturbed this [c]ourt's power to engage in sentence comparison."

In order to determine whether Appellant's case is a "rare instance in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in [a] closely related case[ ]," we first have to know the charges and sentence we are comparing. In other words, unless we know SSgt Alton's charges and sentence, we do not have information to determine whether we are required to engage in sentence comparison. Second, we have to take into consideration the nature of the record and whether SSgt Alton's allegations are closely related to Appellant's case; given that SSgt Alton was a co-conspirator of Appellant, we find their cases are inextricably intertwined. We find that our superior court's decision in *Jessie* would permit external evidence of sentences in closely related cases where those cases are raised in the record. In turn, we also believe *Jessie* did not overrule *Sothen* or *Lacy*, and this court is still permitted to consider matters outside the record for purposes of sentence comparison, and specifically in this case, to consider the results of SSgt Alton's court-martial by way of the STR.[6]

---

[6] *See also United States v. Perkins*, 40 C.M.R. 885, 887 (A.C.M.R. 1969), where in the aftermath of *Fagnan*, the Army Court of Military Review allowed the sentences adjudged in six other general court-martial cases "involving the same disturbance which formed the basis" of appellant's conviction to be used in sentence comparison. The court concluded,

In making this determination, we distinguish this opinion from *United States v. Finco*, No. ACM S32603 (f rev), 2021 CCA LEXIS 603 (A.F. Ct. Crim. App. 16 Nov. 2021) (unpub. op). In *Finco*, the appellant raised an issue of sentence severity and moved to attach a declaration he wrote about the conduct of two other Airmen. *Id*. at *3. He also moved to attach Air Force trial summaries from March 2019 that provided some details about one of those Airmen's court-martial, and the other's administrative discharge. *Id*. Although that panel granted an unopposed motion to attach, the panel opined that in "Applying *Jessie*, we see no references to [other accused] during Appellant's trial or in the allied papers of the record of trial. Accordingly, we understand that we are not permitted to consider the outside-the-record submissions that Appellant moved to attach." *Id*. That panel further stated, "In [a]ppellant's case, the stipulation of fact does not mention [the other Airmen]. The parties have not identified other portions of the record referencing [other Airmen], and we found no specific or generic references to them during our review." *Id*. at *4.

Appellant's case is distinguishable from *Finco*, where the record in the instant case demonstrated Appellant's and SSgt Alton's cases were closely related, while the record in *Finco* failed to raise the issue of whether the cases the appellant sought to compare were closely related to his own. Upon review of SSgt Alton's STR, all of the charges and specifications which he faced and was convicted of, including manslaughter under Article 119, 10 U.S.C. § 919, UCMJ, occurred on the same date as Appellant's charges and specifications. Also, based on our review of SSgt Alton's STR, both SSgt Alton and Appellant were charged with conspiracy to obstruct justice and with obstruction of justice for the same wrongful acts. SSgt Alton was a far more culpable actor in this series of crimes due in large part to being the driver, senior in rank, and directing the course of action in the attempted cover-up. For his crimes, including being found guilty of manslaughter (for which he received ten years' confinement by itself), SSgt Alton received a total of 14 years of confinement and a dishonorable discharge. While the sentences are disparate between the two co-

---

> The records of trial in the cases involving the sentences which the defense would have us consider have each been reviewed by a general court-martial convening authority, and, following receipt in the Office of The Judge Advocate General of the Army, have all in due course been referred to the same Board of Review which commenced the appellate review of this case and thence to its successor, the Court of Military Review. Therefore, under the authorities, we properly may take judicial notice of these six records of trial and their contents, including the adjudged and approved sentences recorded therein.

*Id*.

actors, given the nature of the charges and findings related to both cases, there is an obvious and appropriate rational basis for the disparity.

Regardless of SSgt Alton's sentence, we firmly believe Appellant's sentence is appropriate for his crimes. The court recognizes that Appellant was not driving the car that hit FM. We also can accept that Appellant may not have fully comprehended what occurred in the immediate aftermath of the accident or when he first arrived at SSgt Alton's residence. However, once Appellant and SSgt Alton returned to the scene and saw FM's body, Appellant chose to conspire with SSgt Alton to obstruct justice by removing evidence from the scene and disposing of that evidence in the Nevada desert. Instead of calling 911 or local authorities to alert them of FM's death, he tried to dissuade the bicyclist, JT, from seeking emergency assistance. All of this occurred while FM's lifeless body remained in the street. The severity of Appellant's misconduct is significant, and although Appellant was junior in rank to SSgt Alton, we are not persuaded that Appellant could not understand the gravity of the crimes he was committing.

We further note the maximum punishment in this case included 20 years of confinement and a dishonorable discharge. Appellant's plea agreement with the convening authority limiting his total amount of confinement to only 12 months is some indication that the sentence was not inappropriate. Appellant's arguments are more in the nature of a request for clemency than an appeal of sentence severity. Having considered Appellant, the nature and seriousness of his admitted offenses, and all matters contained in the record of trial, to include all matters Appellant submitted in his case in extenuation, mitigation, and clemency, we conclude the approved sentence, including a dishonorable discharge, is not inappropriate.

### III. CONCLUSION

The Specification of Charge I and Charge I are **DISMISSED WITH PREJUDICE**. The remaining findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(d), UCMJ, 10 U.S.C. § 866(d). Accordingly, the findings, as modified, and sentence are **AFFIRMED.**

FOR THE COURT

Carol K. Joyce

CAROL K. JOYCE
Clerk of the Court